OPINION
{¶ 1} Defendant-appellant, Carlos Mayes ("appellant"), appeals from the October 21, 2003 judgment and sentence of the Franklin County Court of Common Pleas, upon a jury verdict finding him guilty of two counts of aggravated murder, and one count each of aggravated burglary and aggravated robbery. For the reasons that follow, we affirm.
 {¶ 2} By indictment filed August 19, 2002, appellant was indicted on two counts of aggravated murder, unspecified felonies in violation of R.C. 2903.01; one count of aggravated burglary, a first degree felony in violation of R.C. 2911.11; and one count of aggravated robbery, a first degree felony in violation of R.C. 2911.01. The aggravated murder counts carried firearm specifications pursuant to R.C. 2929.04(A)(7) and 2941.145. The remaining counts carried one firearm specification each pursuant to R.C. 2941.145. The charges in the indictment stemmed from the shooting death of Eric "Snoop" Byrd ("Byrd") on December 17, 2000.
 {¶ 3} The facts adduced at trial consisted of the following. Anthony Crockron ("Crockron"), testified on behalf of the State. On December 17, 2000, Crockron met Byrd at Theresa Washington's ("Washington") apartment located at 1950 Denune Avenue, Apartment B, in Columbus, Ohio. Crockron testified that Washington permitted Byrd to occasionally sell drugs out of her apartment.
 {¶ 4} That evening, an eighteen-year old female, later identified as Thomasina Jordan ("Jordan"), knocked on the door and indicated she wanted to purchase cocaine. After Byrd sold her the cocaine she left the apartment. A short time later, Jordan knocked at the door again. Crockron testified Byrd opened the door and two masked gunmen came into the apartment. Crockron indicated there was a distinct height difference between the two gunmen. Crockron described the taller man as "between 6' to 6'1, between maybe 175 and 180 pounds with black clothing on, black mask, the kind you buy in any novelty store with the holes in it" and "dark skin." (Tr. at 40.) Crockron testified the tall man was carrying a "tech-9 firearm." Crockron described the second perpetrator as "short, stocky, wearing a yellow-blue bandanna wrapped around his face," and carrying a .380 silver-plated or nickel-plated semi-automatic firearm. Id. at 42.
 {¶ 5} Crockron testified the tall man demanded money and whatever drugs were available. Crockron testified the tall man took the drugs and approximately three to four hundred dollars from Byrd. As the shorter man stood in the doorway and the tall man backed toward the door, Crockron testified he heard one gun shot and witnessed Byrd fall to the ground. Crockron testified he did not see who shot Byrd, as he was standing partially behind the door while the shooting occurred. Id. at 45, 54. Crockron slammed the door shut and instructed Washington to call 911. "Seconds later," Crockron ran outside in an attempt to locate the gunmen. Id. at 74. Crockron testified he saw a police officer outside and told him someone shot his friend. Crockron subsequently gave a statement to the police that he thought the tall man with the tech-9 firearm shot Byrd because "that's the person I saw with the gun," and "there was another individual with the gun that was pointed at [me] at first." Id. at 57. On cross-examination, Crockron testified he was a "doorman" for Byrd when he sold drugs at Washington's apartment, and that Byrd paid him for his services with drugs or money.
 {¶ 6} Jordan testified that on the date of the incident, she got into a car with James Hargrove ("Hargrove") and appellant, who both informed her they were going to rob someone. Appellant carried a silver gun, and Hargrove carried a "big gun" with a curved clip. Id. at 139. Hargrove parked the car in an alley in the area of Denune and Joyce Avenues. Hargrove and appellant instructed Jordan to purchase drugs from Byrd at the incident location while they waited for her in the car. Jordan purchased the drugs from Byrd, and reported back to appellant and Hargrove. Appellant and Hargrove questioned her regarding who was in the apartment and if the individuals were armed. A short time later, Jordan went back to the apartment "to help them get inside to where they can rob him." Id. at 136.
 {¶ 7} Jordan knocked again on the apartment door. As soon as the door opened, Jordan testified appellant and Hargrove went inside the apartment and she ran back towards the car. Jordan testified she was waiting inside the car when she heard a gunshot. Subsequently, Jordan observed appellant and Hargrove run towards the car. Jordan testified that when appellant got into the car he stated, "man, I can't believe I shot him. I can't believe I shot him." Id. at 137. Appellant and Hargrove gave Jordan $50 in cash and $50 worth of crack cocaine for her role in the incident.
 {¶ 8} Jordan did not advise the police of any information related to Byrd's death until she was arrested on February 27, 2001 on unrelated charges. Jordan testified that she agreed to serve a five-year prison sentence in exchange for her testimony against appellant and Hargrove. On cross-examination, Jordan admitted she smoked crack cocaine on a daily basis in December 2000. When asked why she offered information about Byrd's murder when she was arrested on unrelated charges, Jordan replied, "because if I am going down, I am not going down by myself." Id. at 163-164.
 {¶ 9} Washington testified that Byrd sold drugs from her apartment at 1950 Denune Avenue in exchange for money, food and drugs. On the date of the incident, Washington testified that two suspects entered her apartment with guns. Washington testified she put her head down on the table and "would not look [at the gunmen] because she was scared." Id. at 89. After a short time, Washington looked up because she thought "they should be done robbing them," and she saw the "shorter" man shoot Byrd. Id. at 90. Washington testified that nothing prevented her view of the gunmen and Byrd, and that there was "no doubt" that the man who shot Byrd was the shorter of the two suspects. Id. at 96. Washington testified that the door blocked Crockron's view of the incident. After the suspects left her apartment, Washington used the telephone to call 911. Washington acknowledged that she was afraid to testify against appellant, and that the State indicated to her she would be arrested if she did not appear as a witness at trial. During cross-examination, Washington admitted to her use of crack cocaine for over 20 years.
 {¶ 10} On the date of the incident, Columbus Police Officer Jeffrey Mills ("Mills"), responded to a shooting call at 1950 Denune Avenue, Apartment B in Columbus, Ohio. Upon his arrival, Mills observed a man standing on the sidewalk, who indicated that someone had been shot at the incident location. Mills asked the man to accompany him inside the apartment. Mills testified he walked through the apartment door and saw a woman who appeared to be visibly upset. Mills testified that the victim was lying in the kitchen area and "appeared to be very critical." Id. at 18. Mills interviewed the man and the woman regarding the shooting, and aired the description of the suspects over his police radio.
 {¶ 11} Charles Ramone White, III ("White"), testified that he shared a jail cell with appellant from approximately October 2002 until May 2003. During that time, appellant told White that he and other individuals "set up a robbery." Id. at 315. Appellant told White that he "robbed [Snoop] at gunpoint and that he shot him." Further, White testified that appellant told him he wanted someone to kill Jordan and asked if he knew anyone who could do it. During cross-examination, White testified regarding his prior experiences of testifying against others charged with crimes in consideration for a reduction of his sentence.
 {¶ 12} At the close of the State's case, the defense moved for an acquittal pursuant to Crim.R. 29. In response, the State acknowledged that no evidence had been presented to demonstrate the element of prior calculation and design in the firearm specifications in both of the aggravated murder counts. The court agreed with the State and granted the Crim.R. 29 motion on that issue, and overruled the motion on the remaining counts.
 {¶ 13} The defense called Jordan as its only witness. Thereafter, the defense rested.
 {¶ 14} Following their deliberations, the jury found appellant guilty of all counts and the accompanying firearm specifications. After the conclusion of the mitigation phase, the jury recommended a sentence of life in prison without parole.
 {¶ 15} On October 16, 2003, the trial judge imposed a sentence of life in prison without parole eligibility for counts one and two, which merged for purposes of sentencing. Further, the court imposed nine years each as to counts three and four, and a three-year term of imprisonment in count three for the firearm specification. The court ordered that each sentence would be served concurrently with one another and the sentence appellant was currently serving in prison.
 {¶ 16} Appellant sets forth the following assignments of error for our review:
I. The verdict of the trial court is against the manifest weight of the evidence.
II. The prosecuting attorney's remarks during closing arguments constituted prosecutorial misconduct in plain error which deprived the appellant of a fair trial in violation of the 14th amendment to the United States Constitution and comparable provisions of the Ohio Constitution.
 {¶ 17} In his first assignment of error, appellant claims that the jury's verdicts were against the manifest weight of the evidence. In particular, appellant challenges the credibility of the State's civilian witnesses.
 {¶ 18} "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 35. In State v. Thompkins
(1997), 78 Ohio St.3d 380, 678 N.E.2d 541, the Supreme Court of Ohio set forth the following standard for a court addressing a criminal conviction based upon a claim that the verdict is contrary to the manifest weight of the evidence:
* * * "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
Id. at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
 {¶ 19} When reviewing a conviction on manifest weight grounds, the evidence is not construed most strongly in favor of the prosecution.State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387, 1993 Ohio App. LEXIS 6050 at *3. The court engages in a "limited weighing of the evidence to determine whether there is sufficient competent, credible evidence that could convince a reasonable trier of fact of the defendant's guilt beyond a reasonable doubt." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 19, quoting Conley,
1993 Ohio App. LEXIS 6050 at *3. The discretionary power to grant a new trial based on the conviction being against the manifest weight of the evidence "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 20} In support of his argument that his conviction is against the manifest weight of the evidence, appellant argues Crockron, Washington and Jordan were not credible witnesses because of their admitted drug use. Appellant further disputes the truthfulness of Crockron's testimony, noting Crockron initially told the police that the tall man shot Byrd, yet he testified at trial that he did not see who shot Byrd. Further, appellant also asserts Jordan's testimony was unreliable because she did not provide any information to the authorities pertaining to the Byrd murder until she was arrested two years later on unrelated charges. Finally, appellant asserts that White's testimony should be disregarded, as he only testified against appellant because of the possibly that he could obtain a reduction in his sentence.
 {¶ 21} The State argues that defense counsel raised credibility issues of the State's witnesses during cross-examination, and the jury was in the best position to assess their credibility. The State asserts the jury could have reasonably determined that Crockron initially believed the tall man shot Byrd because of the position of the gunmen immediately after they entered the apartment. Further, the State asserts that Jordan offered credible testimony because she did not have to provide any information related to the Byrd murder, and would not have been charged in the Byrd murder had she maintained her silence. Finally, the State contends that Crockron, Washington and Jordan's admitted drug use, and White's credibility as a jailhouse snitch are credibility issues within the province of the jury.
 {¶ 22} In support of its position, the State cites State v. Golden
(Dec. 20, 2001), Franklin App. No. 01AP-367, 2001 Ohio App. LEXIS 5721. In Golden, the defendant argued his conviction was against the manifest weight of the evidence, as the witnesses were either on drugs or intoxicated at the time of the incident. The defendant also confessed to cellmates in the jail and argued against their credibility. In affirming, we found "the jury was able to observe these witnesses and determine whether they were believable," and concluded "assessment of credibility was within the province of the trier of fact." Id at *18.
 {¶ 23} We agree with the State's position and reliance on Golden. In this case, defense counsel cross-examined the State's witnesses and brought any inconsistencies within their testimony to the jury's attention. "The jury was free to believe all, part, or none of the testimony of each witness." State v. Colvin, Franklin App. No. 04AP-421, 2005-Ohio-1448 at ¶ 34. As such, any weight that should be given to alleged inconsistencies in the witnesses' testimony were determinations within the province of the jury, and such inconsistencies do not render a conviction against the manifest weight of the evidence. State v. Raver,
Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v.Nivens (May 28, 1996), Franklin App. No. 95AP-1236, 1996 Ohio App. LEXIS 2245 at *7.
 {¶ 24} Moreover, an appellate court may not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is manifestly clear that the fact finder lost its way. State v.Green, Franklin App. No. 03AP-813, 2004-Ohio-3697, at ¶ 25. See, also,State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28. Based on the record before us, we find there was sufficient competent, credible evidence to support appellant's convictions beyond a reasonable doubt. For the foregoing reasons, we find the jury's verdicts were supported by the manifest weight of the evidence. Accordingly, appellant's first assignment of error is overruled.
 {¶ 25} In his second assignment of error, appellant alleges the State committed prosecutorial misconduct by making several improper statements during closing argument.
 {¶ 26} We begin by noting appellant did not object during the prosecutor's closing argument. In general, a court will not consider alleged errors that were not brought to the attention of the trial court. However, Crim.R. 52(B) provides that a court may consider errors affecting substantial rights even though they were not brought to the attention of the trial court. "`Plain error is an obvious error * * * that affects a substantial right.'" State v. Yarbrough, 95 Ohio St.2d 227,244, 2002-Ohio-2126 at 108, 767 N.E.2d 216, quoting State v. Keith
(1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47. An alleged error constitutes plain error only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different.Yarbrough at 244-245. "Notice of plain error is taken with the utmost caution only under exceptional circumstances and only where necessary to prevent a miscarriage of justice." State v. Martin, Franklin App. No. 02AP-33, 2002-Ohio-4769 at ¶ 28.
 {¶ 27} In general, prosecutors are given considerable latitude in opening statement and closing argument. State v. Ballew (1996),76 Ohio St.3d 244, 255, 1996 Ohio 81, 667 N.E.2d 369. In closing argument, a prosecutor may comment on "`what the evidence has shown and what reasonable inferences may be drawn therefrom.'" State v. Lott
(1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting State v.Stephens (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773. A prosecutor may not express his personal belief or opinion as to the credibility of a witness, the guilt of an accused, or allude to matters that are not supported by admissible evidence. Smith at 14.
 {¶ 28} The test for prosecutorial misconduct is whether remarks were improper and, if so, whether those remarks prejudicially affected substantial rights of the accused. State v. Smith (1984), 14 Ohio St.3d 13,14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis is the fairness of the trial and not the culpability of the prosecutor. Smithv. Phillips (1982), 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78.
 {¶ 29} In his merit brief, appellant contends the State mislead the jury about the strength of its case. With regard to the evidence presented at trial, the prosecutor stated:
You also see something else in there. Quality of witnesses not quantity. I went through it with Chuck how many witnesses we had on there. You know what, Ladies and Gentlemen, I could have brought 50 people in here from the neighborhood saying that they heard one shot. We don't do that. Not at all. Why would I do that? I would imagine you guys are firmly convinced, without a problem, there was only one shot fired. Absolutely no evidence to the contrary.
(Tr. at 474.)
 {¶ 30} Appellant also alleges that the State made improper comments regarding the defense theory of the case and implied that appellant's trial counsel lied to the jury:
Think about it. Their one witness, was Thomasina Jacobs [sic] [Jordan] about James Hardgrove and Carlos Mayes being there. They recalled her. Have they conceded?
Reasonable doubt. A martian could have come down and fired it out of his ray gun. That is not reasonable. This was a shot, just as everybody said, by Carlos and his .380, period.
Id. at 479.
Let's get right to it. This shell casing. You know, I made a mention in voir dire that there were [sic] going to be — that I had heard years ago that there were going to be some people in this business that would try to convince folks such as yourselves that elephant prints made in the dust of a jungle floor were actually made by a duck-billed platypus wearing elephant shoes. That is what they're trying to sell you.
Id. at 499-500.
 {¶ 31} Appellant further claims the prosecutor misstated the law by attempting to shift the burden of proof to appellant:
Same vein, there is absolutely no evidence to the contrary that Carlos Mayes didn't murder Eric Byrd.
Tr. at 473-474.
 {¶ 32} The State contends it properly commented on the evidence presented at trial and the "obvious defects in the defendant's theory." (State's Brief at 7.) The State further asserts that it did not misstate the law, and only summarizes the evidence which demonstrates appellant's guilt beyond a reasonable doubt. Finally, the State contends that even if its statements during closing argument were deemed improper, under a plain error analysis, the outcome of the trial clearly would not have been different.
 {¶ 33} Here, the trial court properly instructed the jury what consideration they may give to closing arguments:
The evidence does not include the * * * opening statements or closing arguments of counsel. Those statements and arguments of counsel are designed to assist you, but they're not evidence themselves.
(Tr. at 520.)
Further, the trial court properly instructed the jury that the State must produce "evidence which convinces you beyond a reasonable doubt of every essential element of the offense." Id. at 516.
 {¶ 34} With regard to the evidence presented at trial, we note that Crockron and Washington testified that on the date of the incident, two masked gunmen entered the apartment. Jordan stated that appellant and Hargrove planned to rob Byrd. Washington saw the shorter man shoot Byrd. White and Jordan both testified that appellant said he shot Byrd.
 {¶ 35} Viewing the State's comments in light of the foregoing evidence, we find that the State did not overstep the bounds of proper conduct. We agree with the State that its remarks during closing arguments, taken in context, were directed toward the evidence presented at trial. Even if we were to find the State acted improperly, under a plain error analysis, its conduct did not prejudicially affect appellant's substantial rights. Based on the evidence presented, and the court's instructions to the jury, the State's comments during closing arguments did not deprive appellant of his right to a fair trial.
 {¶ 36} Appellant relies on State v. Braxton (1995),102 Ohio App.3d 28, 656 N.E.2d 970, in support of his argument that the State's comments were improper. In Braxton, the Eighth District found "in opining that the defense was setting up and hiding behind a smoke screen, the prosecutor improperly intimated that defense counsel `had suborned perjury by manufacturing, conceiving and fashioning lies.'" Braxton at 22 citing Smith at 14. However, the Braxton court found that the prosecution's comments were harmless, as the jury would have found the defendant guilty absent the improper remarks.
 {¶ 37} As in Braxton, even if we were to find the State's comments were improper, in light of the evidence presented at trial, the State's comments were harmless. Accordingly, appellant's second assignment of error is overruled.
 {¶ 38} For the foregoing reasons, appellant's second assignment of error is overruled.
 {¶ 39} Accordingly, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Lazarus and French, JJ., concur.