OPINION
{¶ 1} Defendant-appellant, Gregory B. Houston ("defendant"), appeals from the August 5, 2004 judgment and sentence of the Franklin County Court of Common Pleas upon a jury verdict finding him guilty of one count of aggravated burglary, and one count of aggravated robbery, as well as firearm specifications included in each count. Defendant was sentenced to serve a ten-year prison term for each conviction, and an additional three-year prison term for the firearm specifications, with each sentence to run consecutively, for an aggregate term of 23 years. For the following reasons, we affirm that judgment.
 {¶ 2} By indictment filed October 25, 2002, defendant was charged with one count of abduction, in violation of R.C.2905.02, a felony of the third degree, with a firearm specification pursuant to R.C. 2941.141 and 2941.145 ("Count 1"); three counts of aggravated murder, in violation of R.C. 2903.01, felonies of the first degree, with death penalty specifications pursuant to R.C. 2929.04(A)(7) and firearm specifications pursuant to R.C. 2941.141 and 2941.145 ("Counts 2-4"); one count of aggravated burglary, in violation of R.C. 2911.11, a felony of the first degree, with firearm specifications pursuant to R.C.2941.141 and 2941.145 ("Count 5"); one count of aggravated robbery, in violation of R.C. 2911.01, a felony of the first degree, firearm specifications pursuant to R.C. 2941.141 and2941.145 ("Count 6"); and one count of having a weapon while under disability, in violation of R.C. 2923.13, a felony of the fifth degree ("Count 7"). These charges stemmed from the alleged abduction of Michelle Bennett ("Bennett") and the robbery and murder of Mousa Al-Janadbeh ("Al-Janadbeh") ("the incident"). Defendant pled not guilty to all of the charges.
 {¶ 3} On May 14, 2004, the trial court held a hearing on defendant's motion to suppress statements he made at the time of his arrest. The trial court overruled the motion, finding that although defendant was in custody, his statements were spontaneous and not made in response to any questioning or actions of the arresting officers. Defendant did not assign this as error in the instant appeal.
 {¶ 4} Defendant's case proceeded to trial on May 18, 2004. The following relevant facts were adduced at trial. Bennett testified that on February 21, 2001,[1] she was at the home of her friend, Missy Leady ("Leady"), when Al-Janadbeh showed up with his friend, Nasser Ismail ("Ismail") and invited the women back to his apartment to "party." (Trans. Vol. II, at 31.) Bennett and Leady agreed, and went with Al-Janadbeh and Ismail back to Al-Janadbeh's apartment.
 {¶ 5} While at the apartment, Bennett admitted she drank vodka and snorted cocaine. She also testified that soon after their arrival, Al-Janadbeh and Leady got into an argument. Leady was on her cell phone talking to another man, which angered Al-Janadbeh. He took her cell phone and threw it up against the wall, breaking the battery. The two began to exchange words, and in the heat of the argument, Bennett claimed Al-Janadbeh said, "how about I give you guys $30 for sex and take you home." (Id. at 33.) Then, according to Bennett, he went to a closet, pulled out a stack of $100 bills, and threw them on the table. This offended Bennett and Leady, and they demanded to be taken home. Al-Janadbeh complied, and along with Ismail, drove the women back to Leady's apartment and dropped them off.
 {¶ 6} When the women arrived at Leady's apartment, defendant, Leady's sister, and a man named "Wayne" were there. Bennett testified that she began to brag about the money that Al-Janadbeh showed them, telling the group it was "the most money" she ever had ever seen. (Id. at 36.) She claimed that defendant began asking her a series of questions about the money, and then demanded that she take him to Al-Janadbeh's apartment. Bennett testified that defendant's demeanor made her fear for her life. (Id. at 38.) According to Bennett, she claimed to have initially told defendant she would not take him to Al-Janadbeh's apartment, but defendant forced her. (Id. at 39.)
 {¶ 7} Defendant and Wayne drove Bennett to Al-Janadbeh's apartment complex in a "long, yellow, dirty" car. Id. Bennett was unable to locate Al-Janadbeh's apartment in the dark, so defendant and Wayne drove Bennett back to Leady's apartment, dropped her off, and ordered her to stay there because they would be back in the morning to pick her up and go to Al-Janadbeh's apartment.
 {¶ 8} Bennett testified that defendant and Wayne showed up the next morning dressed in black clothes and wearing gloves. They drove to Northland Mall, near Al-Janadbeh's apartment, where Bennett called Al-Janadbeh and told him that she wanted to come see him and asked for his address. After he gave her his address, defendant, Wayne, and Bennett drove to Al-Janadbeh's apartment and parked in a lot near his building. Bennett got out and went up to Al-Janadbeh's door, while defendant and Wayne each took a position beside the door, standing back so they could not be seen. When Al-Janadbeh answered the door, he reached his arm out to Bennett to hug her, at which time, defendant rushed in, pushing both Bennett and Al-Janadbeh into the apartment. (Id. at 45.)
 {¶ 9} Once inside, Bennett testified that Wayne put a gun to her throat, and ordered her to find the money. Defendant then proceeded to pistol-whip Al-Janadbeh, and demanded money. (Id. at 46.) Al-Janadbeh stated that he deposited the money in the bank, and began to plead for his life. (Id. at 48.) As that was going on, Bennett heard someone coming down the stairs next to the apartment, so she told defendant and Wayne. (Id. at 50.) Wayne pushed Bennett out of the way and ran out the door, and Bennett immediately followed. Defendant was behind Bennett, and she claimed that when he began to exit thru the door, he fired a shot. She also testified that she heard another gunshot before she reached the car. (Id.) Wayne and Bennett ran to the car, reaching it before defendant, who walked. According to Bennett, when defendant got in the car, he stated that he had shot Al-Janadbeh in the leg. (Id. at 52.)
 {¶ 10} Bennett stated that the gun was thrown out the window near McKinley Avenue, and a bag containing some of Al-Janadbeh's possessions was thrown out of the window near Rogers Avenue. Defendant retained $80 in cash that he found next to Al-Janadbeh's computer. Thereafter, Bennett claimed that defendant and Wayne "tossed" her out of the car. (Id. at 56.) Bennett testified that she did not go to the police because she was scared for her life.
 {¶ 11} During trial, Bennett testified that she spoke to the police voluntarily, and disclosed that she would receive immunity for her involvement in the incident in exchange for her testimony against defendant. Bennett also admitted that she had abused substances during the evening she and Leady were at Al-Janadbeh's apartment, and further acknowledged that she had been addicted to crack cocaine for several years prior thereto. At the time of trial, Bennett divulged that she was serving a sentence for robbery at Community Based Correctional Facility on Alum Creek Drive.
 {¶ 12} Ismail, a longtime acquaintance of Al-Janadbeh, testified that he first met Bennett and Leady when he and Al-Janadbeh picked them up at Leady's apartment. While en route, he claimed that the women asked for $40 so that they could buy cocaine. Al-Janadbeh did not have any money on him, so he borrowed it from Ismail. After purchasing the cocaine, they proceeded to Al-Janadbeh's apartment. There, Bennett and Leady snorted the cocaine they purchased, and smoked marijuana. Ismail acknowledged that Al-Janadbeh had an argument with one of the women because he was angry that she had invited someone else over to his apartment. (Trans. Vol. III, at 47.) According to Ismail, the argument ended when Al-Janadbeh told the women he wanted to take them home. Ismail told Al-Janadbeh he would ride with him, but he first wanted to change his clothes. Ismail left the room and went into Al-Janadbeh's bedroom to change. While Ismail was changing, Al-Janadbeh came in and repaid the money Ismail had lent him earlier that evening. They then drove Bennett and Leady to Leady's apartment without further incident. Ismail testified that Al-Janadbeh did not ask the women for sex that evening, although Al-Janadbeh told Ismail that he had sex with them in the past. (Id. at 66.) Ismail also stated that Al-Janadbeh did not show the women a stack of $100 bills. (Id. at 70.) A few days later, Ismail could not get a hold of Al-Janadbeh on his phone, so he and a friend went over to Al-Janadbeh's apartment. The door was unlocked, and when Isamil went in, he saw Al-Janadbeh laying on the floor.
 {¶ 13} Nakesha Clark ("Clark") and Terrence Turnbo ("Turnbo") lived together in Al-Janadbeh's apartment complex. They both testified that they saw three people, one short white female and two black males, running from one of the buildings. Clark stated that the female and one of the males looked "kind of scared," and were the first ones to get in a yellow car parked in the parking lot. (Trans. Vol. III, at 13.) According to Turnbo, the first male that ran to the car was heavyset, and the second male, who walked to the car, was tall and slim. (Id. at 30-31.) Once in the car, they sped off. (Id. at 13.)
 {¶ 14} Columbus Police Detective Charles Distlehorst ("Officer Distlehorst") testified that he heard over the radio that Sergeant Mike Robinson was following a possible homicide suspect by the name of Gregory Houston. (Trans. Vol. II, at 172.) Officer Distlehorst, who was familiar with defendant, responded to the call. (Trans. Vol. II, at 172.) Spotting defendant in a tan car, Officer Distlehorst approached and told defendant to exit the vehicle. Defendant gave a false name, but Officer Distlehorst told defendant that he knew that his name was Gregory Houston and informed defendant there was a warrant for his arrest. (Id. at 173.) Defendant attempted to escape, but was wrestled to the ground. Officer Distlehorst testified that he did not tell defendant why he was being arrested, nor did he disclose that defendant was wanted on a murder warrant. (Id. at 174.) Officer Distlehorst further testified that in the police cruiser, defendant made several spontaneous statements, including, "I'm not going to take the rap for this." Id.
 {¶ 15} Trial commenced on May 18, 2004. After presentation of the state's case, the trial court dismissed Count 7, having a weapon under disability, and dismissed Count 2, aggravated murder with specifications, after the defense rested. During deliberations on May 26, 2004, the jury sent the judge a note, asking for guidance on how to proceed given that they were at an impasse because two jurors felt defendant was not present when the offenses occurred. Over objection from defense counsel, the trial court gave the Howard charge. On May 27, 2003, the jury found defendant guilty of Count 5, aggravated burglary, and Count 6, aggravated robbery, including firearm specifications on each count, and not guilty of Count 1, abduction, and Counts 3 and 4, aggravated murder.
 {¶ 16} On August 4, 2004, the trial court sentenced defendant to 23 years; a ten-year prison term for each conviction, and an additional three-year prison term for the firearm specifications, with each sentence to run consecutively.
 {¶ 17} Defendant appeals, assigning the following three assignments of error:
Assignment of Error Number 1:
THE TRIAL COURT ERRED IN ALLOWING A WITNESS TO TESTIFY ABOUT HEARSAY STATEMENTS OFFERED BY THE PROSECUTION WHERE THE DEFENDANT HAS HAD NO PRIOR OPPORTUNITY TO CROSS-EXAMINE THE DECLARANT AND COMPOUNDS THAT ERROR WHEN IT REFUSES TO ALLOW THE DEFENSE TO UTILIZE ADDITIONAL HEARSAY STATEMENTS WHICH OUGHT IN FAIRNESS BE CONSIDERED CONTEMPORANEOUSLY WITH THE PRIOR HEARSAY STATEMENTS.
Assignment of Error Number 2:
THE TRIAL COURT ERRED IN ENTERING JUDGMENT OF CONVICTION FOR AGGRAVATED ROBBERY AND AGGRAVATED BURGLARY BECAUSE THOSE CONVICTIONS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. [SIC]
Assignment of Error Number 3:
THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT TO NON-MINIMUM, MAXIMUM, CONSECUTIVE SENTENCES BASED ON FACTS NOT FOUND BY THE JURY OR ADMITTED BY APPELLANT.
 {¶ 18} In his first assignment of error, defendant advances two arguments. First, he argues that the trial court erred in allowing Detective Kathryn Justice ("Detective Justice") to testify about statements Leady made when interviewed, during which Leady identified defendant as going by the nickname of "Big Boy." According to defendant, Detective Justice's testimony was hearsay, and its admission violated his right of confrontation guaranteed by the federal and state constitutions. Second, defendant argues that after Detective Justice testified about Leady's identification of defendant as "Big Boy," the trial court erred by not allowing defendant to introduce the police investigative videotape to show that Leady's identification of defendant as "Big Boy" did not mean that defendant was the same "Big Boy," who was with Bennett and Wayne in Al-Janadbeh's apartment. We disagree with both arguments.
 {¶ 19} The testimony at issue under this assignment of error is as follows:
Q. And after the interview of Missy Leady, did you have a name and a face to put with the words big boy?
A. Yes.
Q. Okay.
Mr. Cicero: Your Honor, I didn't hear that questions. Can that be read back?
Thereupon, the question was read.
By Mr. Mitchell:
Q. Did you?
A. Yes.
Q. And was that Greg Houston, the defendant?
A. Yes.
Q. Now, I'm just going to ask you a general question about protocol, the way that you guys handle investigations.
Do you guys present photo arrays to witnesses of suspects of which you have doubts?
A. No.
Q. Is a photo array something that is used by means of a confirmation tool rather than an investigative tool?
A. I would say both.
Q. Would you say that a photo array is something that is used for identification purposes or for confirmation of identification?
Mr. Simmons: Objection, your Honor.
The Court: Basis?
Mr. Simmons: Can we approach?
The Court: No. Tell me your objections.
Mr. Simmons: This never never land of investigation and confirmation is mixed. It's calling for a conclusion. That is not admissible in evidence.
The Court: Mr. Mitchell.
Mr. Mitchell: I'm not sure what that —
The Court: The objection here is, is that by asking for confirmation of the investigation, the implication is that the witness has an opinion concerning the individuals.
Mr. Mitchell: Yes.
Mr. Simmons: That is what we are objection to.
The Court: What is the relevancy of her opinion?
Mr. Mitchell: Well, the point I was trying to make is — I guess I can make it another way, if the court would ask me to do do.
The Court: Ladies and Gentlemen, you have allusions, inferences, testimony about the name of Greg Houston surfacing from someone or people other than those that have testified in the courtroom, i.e. Michelle Bennett. Those people have not testified.
You shall not consider the fact that other people may have suggested the name of Greg Houston to have any relevancy to this case whatsoever, other than the fact to explain the actions the police may take. You may infer other people who may have given the name of Greg Houston, you may not infer from that anything concerning this defendant's guilty.
Clear?
Mr. Simmons: Yes, Sir.
On redirect:
Defense counsel: And when you showed Melissa Leady this photo array isn't it true that she told you this was not the same Big Boy that you and her were discussing?
Prosecution: Objection.
The Court: Sustained. The jury will disregard — the jury will disregard anything concerning Melissa Leady in this case. She is not a witness.
 {¶ 20} As an initial matter, we note that defendant did not object to the questions posed by the state to Detective Justice regarding Leady's identification of defendant as "Big Boy." When counsel for defendant objected to subsequent questioning, the basis for the objection was that it called for Detective Justice to state a conclusion. Though defendant maintains that Detective Justice's testimony was inadmissible hearsay that violated his constitutional right of confrontation, he did not timely object to her testimony, nor did he assert a constitutional violation as the basis of his objection. See Evid.R. 103(A)(1); State v.Murphy (2001), 91 Ohio St.3d 516, 532. As such, defendant has waived his constitutional argument unless plain error exists. SeeState v. Barnes (2002), 94 Ohio St.3d 21, 27; State v. Allen
(1995), 73 Ohio St.3d 626, 634; Crim.R. 52(B).
 {¶ 21} Under the plain error standard, we must first find error, "a deviation from a legal rule." Barnes, supra, at 27. Moreover, the error must be "obvious" and must have impacted the defendant's "substantial rights" by affecting the outcome of the trial. Id., citing State v. Sanders (2001), 92 Ohio St.3d 245,257, citing State v. Keith (1997), 79 Ohio St.3d 514, 518. Even if a forfeited error satisfies the foregoing, Cr.R. 52(B) does not mandate that the appellate court correct it. To that end, the Supreme Court of Ohio has "acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error `with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" Barnes,
supra, at 27, quoting Long, supra, at 91.
 {¶ 22} Defendant does not directly deal with the issue of his untimely objections, but tacitly acknowledges the same by arguing that United States v. Cromer (C.A.6, 2004), 389 F.3d 662, which construed Crawford v. Washington (2004), 541 U.S. 36,124 S.Ct. 1354 (statements of a confidential informant are testimonial in nature and may not be offered by the government to establish the guilt of an accused absent an opportunity for the accused to cross-examine the informant), is similar to this case, and as a result, we should reach the same result.
 {¶ 23} As relevant to the instant appeal, the Sixth Circuit in Cromer considered whether the trial court's admission of a police officer's testimony, which was offered for the truth of the matter, concerning information provided by a confidential informant violated the Confrontation Clause. The central issue at Cromer's trial was whether he was involved in illegal activity, and the statements of the confidential informant were the lynchpin of the government's case. And, in fact, Cromer's first trial ended in a hung jury because the government's evidence against him was so weak. The Sixth Circuit found that the statements of the confidential informant were testimonial, and because they were offered for the truth of the matter, Cromer's constitutional right of confrontation was triggered. Thus, admission of the officer's testimony was error, and in light ofCrawford, the error was plain. The court concluded by finding that Cromer's substantial rights were effected because "[i]n the context of a case as close as this one on the central issue of whether the defendant was involved in any illegal drug activities, the admission of these statements directly tying Cromer to the crime likely impacted the outcome of the trial." Id.
 {¶ 24} We find this case, however, readily distinguishable. It is true that the statements Leady made to Detective Justice during questioning can be considered testimonial. UnlikeCromer, however, Detective Justice's testimony regarding Leady's out-of-court statements was not offered for the truth of the matter. Rather, pursuant to the limiting instruction given by the trial court, which will be discussed infra, Detective Justice's testimony concerning Leady's identification of defendant as "Big Boy" was to be considered for the sole purpose of explaining police action, which is not hearsay. State v.Banks, Franklin App. No. 03AP-1286, 2005-Ohio-1943; State v.Price (1992), 80 Ohio App.3d 108, 110, citing State v. Blevins
(1987), 36 Ohio App.3d 147, 149. As such, defendant's right to confrontation was not implicated. Another significant distinction between Cromer and the case sub judice is that, here, defendant's substantial rights were not affected. Even if we accepted defendant's contention that Detective Justice's testimony helped establish that the person Leady identified as "Big Boy" was the same person who took Bennett to Al-Janadbeh's apartment, thereby implicating him in the crimes, such testimony was hardly the lynchpin of the state's case, nor did it affect the outcome of the trial. Defendant admits to such under his second assignment of error, in which he argues that "[t]he only evidence that [defendant] was purportedly involved in the aggravated burglary and aggravated robbery came from the testimony of Michelle Bennett." (Appellant's Brief at 28.)[2] Indeed, the record discloses that the state did not rely on Leady's out-of-court identification of defendant to support his convictions, but rather, relied almost exclusively upon the testimony of Bennett, Clark, Turnbo, as well as defendant's own statements at the time he was apprehended. We find the factual differences between this case and Cromer
preclude a finding of plain error.
 {¶ 25} As mentioned supra, the trial court gave the jury a limiting instruction regarding Detective Justice's testimony. It instructed the jury that while they may consider out-of-court statements made by non-testifying witnesses to explain police action, they were to disregard the same for all other purposes, and further admonished against drawing inferences regarding defendant's guilt from any such testimony. Defense counsel offered no objection to this instruction. Given that a jury is presumed to follow a trial court's instructions, State v.Cockroft, Franklin App. No. 04AP-748, 2005-Ohio-748, at ¶ 14, citing Pang v. Minch (1990), 53 Ohio St.3d 186, this court must assume that the challenged statements were received and utilized by the jury only for foundation purposes.
 {¶ 26} Further, even had the trial court admitted hearsay evidence regarding Leady's out-of-court statements, such error would be harmless given that the "remaining evidence, standing alone, constitute[d] overwhelming proof of the defendant's guilt." State v. Williams (1983), 6 Ohio St.3d 281, paragraph six of the syllabus. See, also, State v. Jenkins, Lake App. No. 2003-L-173, 2005-Ohio-3092, at ¶ 37, citing Coy v. Iowa (1988),487 U.S. 1012, 1021-1022, 108 S.Ct. 2798 (applying the harmless beyond a reasonable doubt standard of Chapman v. California
(1967), 386 U.S. 18, 24, 87 S.Ct. 824, to Confrontation Clause violations).
 {¶ 27} In his second argument, defendant asserts that the trial court erred by not allowing him to introduce Leady's statements to the police, via the videotape of Leady's questioning, to show that her identification of defendant as "Big Boy" did not mean that he was the "Big Boy" with Bennett in Al-Janadbeh's apartment. He contends that the videotape was admissible under Evid.R. 803(8), and by failing to admit the same, his due process rights were violated.
 {¶ 28} The state contends, and we agree, that defendant did not raise this argument during trial, and, therefore, has waived all but plain error. Even had defendant preserved this argument, the statements Leady made to Detective Justice in the police videotape are not admissible under Evid.R. 803(8) as a public record or report.
 {¶ 29} Evid.R. 803(8) sets forth the business records exception to the hearsay rule and provides:
Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (a) the activities of the office or agency, or (b) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, unless offered by defendant, unless the sources of information or other circumstances indicate lack of trustworthiness.
Evid.R. 803(6) and 803(8) provide hearsay exceptions for records of regularly conducted activities (business records) and for public records and reports. State v. Watkins (1981),2 Ohio App.3d 402; Randle v. Gordon (Oct. 29, 1987), Cuyahoga App. No. 52961. In order for a police report, or in this case, the videotape of Leady's questioning, to fall within the public records exception, the report (or videotape) must set forth matters observed pursuant to a duty to report by one charged with that duty and it must be offered by the defendant. Evid.R. 803(8); Cincinnati Ins. Co. v. Volkswagen of America, Inc.
(1987), 41 Ohio App.3d 239. To fall within the business records exception, the report must be made at or near the time of the event by a person with knowledge, in the regular course of the agency's business. Evid.R. 803(6); Cox v. Oliver Machinery Co.
(1987), 41 Ohio App.3d 28.
 {¶ 30} In this case, however, Leady was under "no duty to report." As such, Leady's statements represent "hearsay within hearsay which is only admissible if the second level hearsay itself falls within a specific exception." State v. Lowry (Aug. 31, 1989), Franklin App. No. 89AP-108. When construing the statutory predecessor to Evid.R. 803(8), the Supreme Court of Ohio stated in Westinghouse Electric Corp. v. Dolly MadisonCorp. (1975), 42 Ohio St.2d 122, 130:
This statute allows the admission of official records, although these records may constitute hearsay, in so far as they consist of facts recorded by public officials who are not present as witnesses. However, the statute does not render admissible statements contained in official reports, where such statements are themselves hearsay. * * *
 {¶ 31} "Evid.R. 805 expressly provides that hearsay within hearsay is not excluded under the hearsay rule if each part of the combined statement conforms with an exception to the hearsay rule provided in the evidence rules." State v. Lowry, supra. Therefore, Leady's statements are not admissible simply because they are contained within an official report; to be admissible, her statements must also fall within a hearsay exception. Id. To that end, defendant does not argue, nor do we find, that Leady's statements fall within a firmly rooted hearsay exception. As such, the trial court did not err in excluding the videotape of Leady's questioning.
 {¶ 32} Based on the foregoing, we find that defendant's right of confrontation was not violated by Detective Justice's testimony because, as per the trial court's limiting instruction, it was not hearsay. We further find that the police videotape was properly excluded, and even if it were admissible, its exclusion was not prejudicial in light of the testimony given by Bennett, Turnbo, Clark, and the statements made by defendant at the time he was apprehended. Having found no plain error, defendant's first assignment of error is overruled.
 {¶ 33} In his second assignment of error, defendant contends that his convictions for aggravated robbery and aggravated burglary were against the manifest weight of the evidence. Within this assignment of error, defendant raises 13 sub-arguments that encompasses three issues. First, defendant challenges Bennett's credibility. Second, defendant takes issue with the trial court's giving of the Howard charge. Lastly, defendant contends that the trial court should have instructed the jury about the testimony of an alleged accomplice.
 {¶ 34} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the jury's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380,386. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the fact finder's resolution of the conflicting testimony.Thompkins, supra, at 387. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 35} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The determination of weight and credibility of the evidence is for the trier of fact. State v.DeHass (1967), 10 Ohio St.2d 230. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58; State v. Clarke (Sept. 25, 2001), Franklin App. No. 01AP-194. As such, the trier of fact is free to believe or disbelieve all or any of the testimony. State v. Jackson (Mar. 19, 2002), Franklin App. No. 01AP-973; State v. Sheppard (Oct. 12, 2001), Hamilton App. No. C-000553. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 22; State v. Hairston,
Franklin App. No. 01AP-1393, 2002-Ohio-4491, at ¶ 17.
 {¶ 36} With respect to defendant's challenge of Bennett's credibility, he argues that she is "not worthy of belief" because: (1) she testified against him in exchange for immunity; (2) she was a drug addict; (3) she abused various substances, which affected her memory, during the events in question; (4) her testimony conflicted with that given by Ismail and Turnbo; (5) she was incarcerated at the time of trial; and (6) she could not remember testifying before the grand jury. (Appellant's Brief at 28.)
 {¶ 37} In response, the state argues that defense counsel raised credibility issues during Bennett's cross-examination, during which she testified at length about her substance abuse history, admitted that she abused substances during the events in question, and divulged the details of her agreement with the state to testify against the defendant in exchange for immunity. The state, therefore, asserts that the jury was in the best position to assess Bennett's credibility. The state further contends the jury could have reasonably determined that much of Bennett's testimony was corroborated by Clark and Turnbo. For example, both Clark and Turnbo stated that they saw one white female and two black males dressed in all black clothing leaving the scene. They also testified they saw the white female and the two black males get into a large, yellow car. The state also explains that the jury could have properly found corroboration of Bennett's testimony that Al-Janadbeh showed her a large sum of money because a large sum was found in a lock box in his apartment. And while Ismail testified that he did not see Al-Janadbeh show Bennett and Leady any money, he also testified that he left the room to change his clothes.
 {¶ 38} We agree with the state's position. A conviction is "not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." State v. Moore,
Montgomery App. No. 20005, 2004-Ohio-3398, quoting State v.Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757. In this case, defense counsel cross-examined Bennett and brought any inconsistencies within her testimony to the jury's attention, as well as the all credibility issues he raises herein. The trial court gave the jury the proper instruction regarding its role in evaluating the credibility of the witnesses, and the jury chose to believe the state's witnesses and version of events as it was free to do. State v. Moore, Montgomery App. No. 20005, 2004-Ohio-3398 (citation omitted); State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus; State v. Nields
(2001), 93 Ohio St.3d 6, 28; (credibility of jailhouse "snitch" was a question for the trier of fact to determine); State v.Mayes, Franklin App. No. 03AP-1154, 2005-Ohio-1769 (credibility of witnesses who used drugs, gave inconsistent testimony, and testified against defendant in exchange for a reduction in sentence, was a question for the trier of fact to determine);State v. Golden (Dec. 20, 2001), Franklin App. No. 01AP-367 (credibility of witnesses who were either on drugs or intoxicated at the time of the incident was a question for the trier of fact). Based on the record before us, weighing the evidence and all reasonable inferences, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
 {¶ 39} Another issue raised under this assignment of error concerns a charge given to the jury pursuant to State v. Howard
(1989), 42 Ohio St.3d 18. Defendant appears to suggest that theHoward charge is inherently coercive, and the very act of giving of the Howard charge to the jury is a prima facie case for reversal based on manifest weight grounds. We disagree.
 {¶ 40} The record indicates that the jury began deliberating on May 25, 2004, and recessed at 6:00 p.m. until morning. After resuming deliberations the next morning, the jurors submitted a question to the trial judge at approximately 4:05 p.m., containing the following request: "Your Honor, we are at an impasse. We have two jurors that feel he was not there. What do we do from here? What guidance can be given?" (Trans. Vol. VI, at 159.) The court then gave the following instructions to the jurors:
There is guidance the court can give you, and I will give that to you now.
Ladies and Gentlemen, This is a new and difficult assignment for you. The process of discussion and deliberation in the jury room is necessarily slow and requires consideration and patience. The secrecy which surrounds your effort prevents others, including me, from knowing when your efforts would result or will result in a verdict. In a large proportion of cases absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror, and not mere acquiescence in the conclusion of other jurors, each question submitted to you should be examined with proper regard and deference to the opinions of others. It is desirable that this case be decided. You are selected in the same manner and from the same source as any future jury would be. There is no reason to believe the case would ever be submitted to a jury more capable, impartial or intelligent than you. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to others' opinions with a disposition to be persuaded. Do not hesitate to re-examine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should re-examine their position given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubts are reasonable considering that it is not shared by others equally honest who have heard the same evidence with the same desire to arrive at the truth and under the same oath. Likewise, jurors for conviction should ask themselves whether they may not reasonably doubt the correctness of a judgment not concurred in by all other jurors.
That is the instructions I will give you.
Now, my direction to you is to go back and continue your deliberations. I think it is wise that unless you can agree by the time the bus comes, and, even, perhaps, given your state, even you might wish to sleep on it tonight. I think that is my best advice to you all. Continue to deliberate. But let's sleep on it tonight and let's continue in the morning and see where we are at. All right.
(Trans. Vol. VI, at 163-164.) After receiving the Howard
charge, the jury resumed deliberations. On May 27, 2004, the jury found the defendant guilty of one count of aggravated burglary and one count of aggravated robbery, with firearm specifications, and not guilty of one count of abduction and two counts of aggravated murder.
 {¶ 41} After a review of the record, we do not find that the trial court abused its discretion in determining that the jury was not irreconcilably deadlocked. While it is true that the jury reached an impasse during deliberations, the trial court's reading of the Howard charge eventually enabled the jury to return the verdicts, which all twelve jurors orally acknowledged in open court. Hence, the trial court properly instructed the jury using the Howard charge to continue deliberations. Indeed, the Supreme Court of Ohio has upheld the use of the Howard
charge, specifically finding that such an instruction is not coercive and is "`intended for a jury that believes it is deadlocked, so as to challenge them to try one last time to reach a consensus.'" State v. Gapen, 104 Ohio St.3d 358, 379, quoting State v. Brown, 100 Ohio St.3d 51, quoting State v.Robb (2000), 88 Ohio St.3d 59, 81; State v. Mason (1998),82 Ohio St.3d 144, 167. Accordingly, in this case, we do not find that the act of giving the Howard charge supports reversal based on manifest weight grounds.
 {¶ 42} Lastly, defendant contends that the trial court erred when it did not give the jury the accomplice instruction that R.C. 2923.03(D) states is required whenever an alleged accomplice testifies against a defendant. According to the record, however, the trial court did, in fact, give this instruction. (Trans. Vol. VI, at 119-120.) Thus, this argument is without merit.
 {¶ 43} For the foregoing reasons, we find the jury's verdicts were supported by the manifest weight of the evidence. Accordingly, defendant's second assignment of error is overruled.
 {¶ 44} In his third assignment of error, defendant argues that based on the facts in the indictment and those supporting the jury's verdict, the trial court erred in sentencing him to non-minimum, maximum, consecutive sentences. In support of his argument, defendant maintains that pursuant to Blakely v.Washington (2004), 542 U.S. 296, 124 U.S. Ct. 2531, rehearing denied (2004), 159 L.Ed.2d 851, 125 S.Ct. 21, and Apprendi v.New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348, he was entitled to a jury determination of those factual findings upon which the trial court based its sentence of ten years as to each of defendant's convictions. Absent such jury findings, he maintains that the trial court was required to sentence him to no more than the statutory minimum of three years on each count, running concurrent, and not consecutive. Aside from his Blakely-based argument, defendant does not take issue with the substantive or procedural process by which the trial court determined his sentences.
 {¶ 45} In Apprendi, the United States Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Id. at 490.) A sentence that is greater than the statutory maximum and that is not based upon facts admitted by the defendant or found by a jury beyond a reasonable doubt, violates the defendant's right to a trial by jury as guaranteed by the Sixth Amendment to the United States Constitution. InBlakely, the United States Supreme Court defined "`statutory maximum' for Apprendi purposes" as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely, supra, at 2537.
 {¶ 46} We reject appellant's Blakely-based argument, just as we have done in a recent line of cases beginning with Statev. Abdul-Mumin, Franklin App. No. 04AP-485, 2005-Ohio-522. In that case, we held:
Ohio's sentencing scheme does not encroach upon the traditional and constitutionally required role of the jury in finding those facts that fix the upper limit of a defendant's punishment for a particular offense. Rather, the upper limit, or in Blakely
terms, the "statutory maximum" sentence to which one accused of a felony knows he will be exposed upon walking through the courtroom door, is established by statute. R.C. 2929.14(B) does not allow judge-made findings to enhance a defendant's punishment beyond the maximum sentence corresponding to the class of offense of which he is convicted or to which he pleads guilty.
See, also, State v. Linville, Franklin App. No. 04AP-917, 2005-Ohio-3150, at ¶ 38; State v. Fout, Franklin App. No. 04AP-1139, 2005-Ohio-3151; State v. Satterwhite, Franklin App. No. 04AP-964, 2005-Ohio-2823; State v. Smith, Franklin App. No. 04AP-859, 2005-Ohio-2560; State v. Sieng, Franklin App. No. 04AP-556, 2005-Ohio-1003; and State v. Cockroft, Franklin App. No. 04AP-608, 2005-Ohio-748.
 {¶ 47} In the present case, the jury's verdict authorized a sentence of three to ten years for each of the two counts for which defendant was convicted, R.C. 2929.14(A)(1), plus a mandatory three years for the firearm specification. R.C.2941.145. The trial court imposed a sentence of ten years for each count, the maximum sentence allowed by statute, and an additional three years for firearm specification, with all sentences to run concurrently. The transcript of defendant's sentencing hearing discloses that the trial court gave its findings and stated its reasons for imposing maximum, consecutive sentences, as required by R.C. 2929.14(B), 2929.14(C),2929.14(E)(4), and 2929.19(B)(2)(d). (Trans. Vol. VI, at 240-246.) As such, we do not find that defendant's sentences are contrary to law. R.C. 2953.08(G)(2)(b). Accordingly, his third assignment of error is not well-taken and is overruled.
 {¶ 48} Based on the foregoing reasons, defendant's first, second, and third assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Petree and McCormac, JJ., concur.
McCormac, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] Nasser Ismail testified to a different date, however, we find the exact date is irrelevant to the instant appeal.
[2] To further buttress his argument, defendant quotes the trial court's statement that "this whole case, as we all know here, really rests on the credibility of one witness." (Appellant's Brief at 28, quoting Tr. Trans. Vol. V at 29.)