[Cite as *State v. Ciboro*, 2018-Ohio-3705.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals Nos. L-17-1038
                                                                                L-17-1039
            Appellee

                                                    Trial Court Nos. CR0201601971
v.                                                                     CR0201602809

Esten Ciboro                                        **DECISION AND JUDGMENT**

            Appellant                               Decided:  September 14, 2018

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Sarah J. Anjum, for appellant.

* * * * *

**JENSEN, J.**

## I.      Introduction

{¶ 1} Appellant, Esten Ciboro, appeals the judgment of the Lucas County Court of

Common Pleas, sentencing him to life in prison after a jury found him guilty of three

counts of rape, two counts of endangering children, and two counts of kidnapping.

Finding no error in the proceedings below, we affirm.

## A. Facts and Procedural Background

{¶ 2} On May 24, 2016, appellant was indicted in case No. CR0201601971 on one count of endangering children in violation of R.C. 2919.22(B)(2), (E)(1), and (E)(2)(d), a felony of the second degree, one count of endangering children in violation of R.C. 2919.22(B)(1), (E)(1), and (E)(2)(d), a felony of the second degree, one count of kidnapping in violation of R.C. 2905.01(A)(3) and (C), a felony of the first degree, and one count of kidnapping in violation of R.C. 2905.01(B)(2) and (C), a felony of the first degree. Four months later, appellant was indicted in case No. CR0201602809 on three counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), felonies of the first degree punishable pursuant to R.C. 2907.02(B). These indictments related to allegations that appellant, along with his father, had been shackling and sexually assaulting appellant's stepsister, S.H., in the basement of their residence. S.H. was 13 years old at the time of the aforementioned indictments.

{¶ 3} After entering pleas of not guilty, appellant indicated his desire to represent himself at trial. The trial court permitted appellant to represent himself, but appointed "standby counsel" to provide assistance. Eventually, the matter proceeded to a jury trial on January 23, 2017.

{¶ 4} At trial, the state called several witnesses. As its first witness, the state called Karen Loudermill. Loudermill originally discovered S.H. during the course of her employment at Holland Building Services. According to Loudermill, she was taking trash out at the Port Authority building in Toledo on May 18, 2016, when she observed

2.

S.H. eating a Honey Bun. Loudermill stated that S.H. "was very frail, clothes was dirty, hair matted to her head." Given S.H.'s condition, Loudermill inquired as to whether she had run away from home. S.H. informed Loudermill that she had indeed run away from home. When asked why she decided to run away, S.H. explained that her father, T.C., punishes her for wetting the bed by shackling her to the basement stairs, making her use the bathroom in a bucket, and forcing her to eat raw noodles and tuna off of the basement floor. Based upon S.H.'s representations, Loudermill called 911 and informed law enforcement of the situation. At the conclusion of the 911 call, the dispatcher informed Loudermill that an officer would be sent to investigate the matter.

{¶ 5} Officer Michael Garcia of the Toledo Police Department was the officer dispatched to S.H.'s location following Loudermill's 911 call. Garcia was also the state's second witness at trial. Garcia generally corroborated Loudermill's testimony concerning S.H.'s condition and the fact that she had been shackled in her basement by T.C.

{¶ 6} For its third witness, the state called Officer Paul Davis of the Toledo Police Department. Davis was working on the evening of May 18, 2016, and was charged with monitoring appellant and T.C. while they awaited booking into the Lucas County jail. In order to safely place appellant and T.C. into their holding cells, Davis had to first check their pockets. During the search, Davis retrieved a set of keys, including a handcuff key, from appellant's right zip cargo shorts pocket.

{¶ 7} As its fourth witness, the state called Detective Terry Cousino of the Toledo Police Department Scientific Investigations Unit. On the evening of May 18, 2016,

3.

Cousino was tasked with executing a search warrant at appellant's residence. At trial, Cousino authenticated several photographs depicting the condition of the residence, including the basement where S.H. was shackled. Referencing the photographs, Cousino testified that the door leading to the basement was kept shut by a bungee cord with a gallon of liquid hanging on it.

{¶ 8} In the basement, Cousino observed a support post to which leg cuffs, chains, and two Olympic barbell weight plates were attached. Adjacent to the support post, Cousino found a five-gallon bucket turned upside down with a pillow lying on top and two water bottles with S.H.'s name lying next to the bucket on the floor. Another five-gallon bucket filled halfway with ammonia was observed in close proximity to the support post. On the main floor, Cousino searched the office and found more sets of handcuffs in a dresser drawer. In the living room, Cousino discovered a set of dumbbells on the floor, which were linked together using handcuffs.

{¶ 9} For its fifth witness, the state called S.H. According to her testimony, S.H. moved into T.C.'s home with her mother, who left the home when S.H. was seven years old. During the relevant time period, S.H. resided with T.C., her sister, Ti.C., and her brother, T.Ci. Appellant, S.H.'s stepbrother, occasionally stayed at the house when he was not staying at his mother's house. After S.H.'s mother left the home, S.H. attempted to run away because she was being fed dried oats and missed her mother's family. Once S.H. was returned to the home, she was locked in the downstairs bathroom as a punishment for running away. According to S.H., it was appellant's idea to lock her in

4.

the bathroom by reversing the door knob so that the lock was on the outside of the bathroom door.

{¶ 10} S.H. testified that she had bed wetting issues that prompted T.C. to lock her in the bathroom and, eventually, in the basement. S.H. would be placed in the bathroom with the door locked whenever T.C. and the rest of the family went out of the house. Occasionally, S.H. would be permitted to sleep in the bathroom on the main floor. On such occasions, S.H. would sleep in the bathtub without blankets or a pillow. If she urinated while sleeping in the bathtub, S.H. would be forced to take a "really cold shower," and then stand in front of the air conditioner.

{¶ 11} As punishment for her bed wetting, S.H. was forced to sleep in the basement without any clothes and with shackles around her feet. When asked how long she was kept in the basement, S.H. stated: "One time I was down there for, like, a year." While in the basement, S.H. was fed raw canned vegetables, bread, dried Ramen noodles, crackers, and tuna. S.H. was also forced to urinate in a five-gallon bucket alongside the support post to which she was shackled. The bucket was partially filled with ammonia. S.H. indicated that being in the basement scared her because there were mice and spiders in the basement.

{¶ 12} S.H. went on to testify that appellant "started touching [her] inappropriately" sometime after she began to be locked in the bathroom. S.H. recounted that the first encounter occurred while she was folding laundry and appellant made her perform oral sex on him. S.H. confirmed that this occurred on more than one occasion

5.

before she turned 13 years old. She also stated that appellant and T.C. would make deals with her to provide her with candy "if they did things inappropriately with [her] or they had [her] do it to them." S.H. later clarified that the "inappropriate things" she was referring to included oral sex and intercourse. S.H. further recounted being in the basement and overhearing T.C. direct her sister, Ti.C., to perform oral sex on him.

{¶ 13} At the conclusion of S.H.'s testimony, the state called its sixth witness, Hallie Dreyer. Dreyer is a forensic scientist at the Ohio Bureau of Criminal Investigation. In that capacity, Dreyer conducted a DNA analysis on, inter alia, the handcuffs that were retrieved from appellant's residence. The results of the analysis revealed that S.H. was a major contributor of DNA and T.C. was a minor contributor of DNA on the handcuffs.

{¶ 14} As its seventh witness, the state called Ti.C. At the time of trial, Ti.C. was seven years old. During her testimony, Ti.C. revealed that she disliked residing in T.C.'s home because the punishments she received were unfair and T.C. "would have sex with [her]." Speaking about punishment, Ti.C. stated that S.H. was punished by being locked up with chains and handcuffs and placed in the basement. She went on to explain that S.H. was also chained up in the bathroom and in the living room from time to time. Ti.C. testified that appellant and T.C. each directed S.H.'s punishments. Ti.C. then reiterated that appellant and T.C. had sex with her and S.H. "more than once." She explained that appellant would have sex with her almost any day that T.C. was not with her.

6.

{¶ 15} For its eighth witness, the state called David Connell, a clinical and forensic psychologist who was retained by the state to review the state's evidence in this case and interview S.H. During his review, Connell performed an educational test with S.H., which revealed that S.H. had a developmental disorder. Ultimately, Connell deemed S.H. to be intellectually deficient and diagnosed her with posttraumatic stress disorder. According to Connell, the treatment of S.H.'s condition would require intensive long-term individual therapy and, potentially, medications to address mental and emotional issues that may arise as S.H. develops.

{¶ 16} As its ninth witness, the state called Lori Hinde. Hinde attends the Maumee United Methodist Church, where she organizes a 5K race that is held each year in honor of her father-in-law. In October 2015, appellant participated in the race alongside T.C., Ti.C., and T.Ci. The family finished the race and attended an award potluck that was held inside the church at the conclusion of the race. Hinde testified that she "loaded up" the children with food after the potluck because it "looked as if they were pretty darn hungry." She also observed T.C. preventing Ti.C. and T.Ci. from finishing their meals.

{¶ 17} For its tenth witness, the state called Kristie Gibbs. In her spare time, Gibbs enjoys running at a Toledo Metropark near her home. During her runs, Gibbs occasionally encountered appellant and the rest of the family, including S.H. Gibbs testified that she observed S.H. with the family in the summer of 2015, but she noticed that S.H. was absent from the runs by the spring of 2016.

7.

{¶ 18} As its eleventh witness, the state called Gayline Diller. Diller became familiar with appellant and the family during the course of her three-year employment with Costco. Diller testified that the family were "regulars" at Costco, meaning they would frequent the store on a daily basis to eat the food samples that were offered. Diller only ever observed appellant, T.C., Ti.C., and T.Ci. together at Costco. S.H. was not present with the rest of the family.

{¶ 19} For its twelfth witness, the state called Sergeant Roy Kennedy of the Toledo Police Department. Kennedy was involved in the execution of the search warrant at appellant's residence. Sometime subsequent to the search, the residence was burglarized. Following the burglary, police were alerted to the fact that property bearing the family's name, including two camera bags with camcorders and video cassettes, were turned into a local pawn shop. Kennedy secured a search warrant to retrieve the home videos, which were eventually admitted into the record and published to the jury. Two of the videos depicted races run in November 2012 by appellant, Ti.C., and T.Ci. A third video captured Ti.C. and T.Ci. opening gifts on December 25, 2012. S.H. was notably absent from the videos.

{¶ 20} As its thirteenth and final witness, the state called an expert in the treatment and diagnosis of child abuse, Dr. Randall Schlievert. Schlievert initially interviewed S.H. and conducted a physical examination on May 23, 2016. During the interview, S.H. informed Schlievert that she ran away from home because T.C. had shackled her in the basement for extended periods of time. S.H. made no mention of sexual abuse during the

8.

interview. Schlievert testified concerning the findings of his physical examination of S.H., indicating that he found swelling in S.H.'s feet as well as semi-circular scarring and skin thickening on the sides and back of the right ankle that was consistent with the shape of a handcuff.

{¶ 21} Schlievert conducted a second interview and examination of S.H. on September 15, 2016, following the reports of sexual abuse. During the second interview, S.H.

> detailed sexual abuse by both [appellant] and [T.C.]. She told [Schlievert] that the first sexual abuse occurred from [appellant], that he forced her to put her mouth on his private area and suck on it. These acts occurred more than once. And then eventually it led to [appellant] putting his tongue on her private parts, and also putting his private part into her back private parts. * * * And she wrote out that [T.C.] put his private part in her front and back private parts, and then, also in her sister's back private part. * * * She said it felt weird, it was numerous times that [T.C.] did this to her, and then also described that he would lay on her as well.

{¶ 22} Despite S.H.'s allegations of sexual abuse, her physical examination was normal. Schlievert explained that a normal examination was not inconsistent with S.H.'s disclosure of sexual abuse. Indeed, Schlievert testified that a normal examination occurs 95 to 98 percent of the time in cases involving delayed disclosure of sexual abuse.

{¶ 23} Based upon his interviews and examinations of S.H., as well as his review of the relevant medical records, Schlievert concluded, to a reasonable degree of medical certainty, that S.H. had been neglected and abused, both physically and psychologically. Moreover, Schlievert interviewed and examined Ti.C., who essentially corroborated S.H.'s reports of sexual abuse.

{¶ 24} Following the presentation of Schlievert's testimony, the state rested. Thereafter, appellant and T.C. moved the court for acquittal under Crim.R. 29, which was denied by the trial court.

{¶ 25} After the trial court denied the Crim.R. 29 motion, appellant and T.C. called T.Ci. as their sole witness. During his testimony, T.Ci. confirmed that S.H. was routinely handcuffed around her ankles as a form of punishment. T.Ci. also indicated that S.H. was forced to steal food because she was not provided adequate nutrition at home. T.Ci. went on to testify that T.C. began touching him inappropriately when he was six years old.

{¶ 26} Following T.Ci.'s testimony, appellant and T.C. rested. They proceeded to renew their Crim.R. 29 motion at the close of evidence. Their motion was once again denied by the trial court. The jury then heard closing arguments, and received its instructions from the trial court. Ultimately, the jury found appellant guilty of two counts of endangering children, two counts of kidnapping, and three counts of rape. At sentencing, the trial court ordered appellant to serve eight years in prison on each of the endangering children counts, eleven years in prison on each of the kidnapping counts,

10.

and ten years to life on each of the rape counts.  All of the sentences were ordered to be served consecutively.

## B.  Assignments of Error

{¶ 27} Appellant has timely appealed his convictions, assigning the following errors for our review:

1.  The verdicts as to two of three counts of rape are plainly erroneous.

2.  The verdicts as to two of the three counts of rape are against the manifest weight of the evidence.

## II.  Analysis

{¶ 28} In his first assignment of error, appellant argues that the verdicts as to two of the three rape counts were plainly erroneous.  Appellant's argument in his first assignment of error centers on whether there was sufficient evidence to support the rape convictions.  In his second assignment of error, appellant contends that the guilty verdicts as to two of the three counts of rape were against the manifest weight of the evidence. Because these arguments are interrelated, we will address them together.

{¶ 29} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  (Internal citations omitted.)  *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).  In making that determination, the appellate court will not weigh

the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 30} When reviewing a manifest weight of the evidence issue, we sit as a "thirteenth juror." *Id.* at 387. That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 31} Here, appellant was convicted of three counts of rape under R.C. 2907.02(A)(1)(b) and (B), which provides:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

12.

* * *

(B) Whoever violates this section is guilty of rape, a felony of the first degree.

{¶ 32} Under R.C. 2907.01(A), "sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." Under the statute, any penetration, however slight, is sufficient to constitute vaginal or anal intercourse.

{¶ 33} Appellant does not dispute the fact that the record contains sufficient evidence to establish the elements of rape as set forth in the above-referenced statute. However, appellant insists that two of the three convictions must be reversed because the basis of those charges was not particularly established. Pointing to S.H.'s testimony, appellant argues that S.H. only reported one act of penetration with any degree of specificity. In support of his argument, appellant cites the Eighth District's decision in *State v. Hemphill*, 8th Dist. Cuyahoga No. 85431, 2005-Ohio-3726.

{¶ 34} In *Hemphill*, the defendant was convicted on 29 counts each of rape, gross sexual imposition, and kidnapping, stemming from a 99-count indictment charging him with 33 acts of rape, gross sexual imposition, and kidnapping committed upon his preteen stepdaughter over a 21-month period. *Id.* at ¶ 1-2. At trial, the state elicited testimony from the victim that identified one discrete instance of rape. *Id.* at ¶ 80. The victim went

13.

on to testify that the defendant would rub her chest and touch her inappropriately "any chance he got." *Id.* at ¶ 81-82. The state then asked the victim whether the defendant had vaginal intercourse with her at least 33 times, to which the victim responded in the affirmative. *Id.* at ¶ 83-87. On appeal from his convictions, the defendant argued that this numerical estimate provided an insufficient basis for his convictions. The Eighth District found that the numerical estimate was "unconnected to individual, distinguishable incidents," and was therefore insufficient to support appellant's convictions on all but one count of gross sexual imposition and two counts of rape. *Id.* at ¶ 88 and 93.

{¶ 35} In the present case, the state provided a factual basis to support appellant's rape convictions without resorting to a numerical estimate such as the one utilized by the prosecution in *Hemphill*. At trial, S.H. testified that appellant made her perform oral sex on him while she was folding laundry. S.H. confirmed that this occurred on more than one occasion and also stated that appellant would give her candy as a reward for sexual acts including oral sex and intercourse. Moreover, Schlievert testified that S.H. informed him that the first sexual abuse occurred when appellant forced her to put her mouth on his private area and suck on it. S.H. further explained to Schlievert that appellant had performed cunnilingus on her and put "his private part into her back private parts."

{¶ 36} The foregoing evidence demonstrates that appellant engaged in three acts of penetration, namely fellatio, cunnilingus, and anal intercourse. Given this evidence, we find that appellant's rape convictions were supported by sufficient evidence.

14.

Moreover, we do not find that this is the exceptional case in which the jury's verdict is against the manifest weight of the evidence. Therefore, appellant's assignments of error are not well-taken.

### III. Conclusion

{¶ 37} In light of the foregoing, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                          _____
                                                           JUDGE
James D. Jensen, J.          

Christine E. Mayle, P.J.                  _____
CONCUR.                                                 JUDGE

                                          _____
                                                           JUDGE