[Cite as *State v. Ciboro*, 2018-Ohio-4627.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals Nos. L-17-1045
                                                                              L-17-1046
          Appellee                                                            L-17-1047

v.                                               Trial Court Nos. CR0201602809
                                                                  CR0201602317
Timothy Ciboro                                                    CR0201601971

          Appellant                              **DECISION AND JUDGMENT**

                                                 Decided:  November 16, 2018

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**OSOWIK, J.**

## Introduction

{¶ 1} In this consolidated appeal, appellant, Timothy Ciboro, appeals the judgment

of the Lucas County Court of Common Pleas, sentencing him to life in prison without

parole after a jury found him guilty of five counts of rape, three counts of endangering

children, and two counts of kidnapping. Finding no error in the proceedings below, we affirm.

**Facts and Procedural History**

{¶ 2} On May 24, 2016, appellant was indicted in case No. CR0201601971 on one count of endangering children in violation of R.C. 2919.22(B)(2), (E)(1) and (E)(2)(d), a felony of the second degree; one count of endangering children in violation of R.C. 2919.22(B)(1), (E)(1) and (E)(2)(d), a felony of the second degree; one count of kidnapping in violation of R.C. 2905.01(A)(3) and (C), a felony of the first degree; and one count of kidnapping in violation of R.C. 2905.01(B)(2) and (C), a felony of the first degree. On July 19, 2016, appellant was indicted in case No. CR0201602317 on one count of endangering children, in violation of R.C. 2919.22(A) and (E)(1) and (E)(2)(c), a felony of the third degree. On September 29, 2016, appellant was indicted on five counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), felonies of the first degree. These indictments related to allegations that appellant, along with his son Esten Ciboro, had been shackling and sexually assaulting appellant's stepdaughter, S.H., in the basement of their residence. Appellant was also charged with sexually assaulting his biological daughter, Ti.C. At the time, S.H. was under the age of 13 and Ti.C. was under the age of 10.

{¶ 3} Early in the criminal proceedings, appellant repeatedly expressed his desire to represent himself. The trial court ultimately granted appellant's motion but appointed "standby counsel" to provide assistance. The cases against appellant and Esten were

2.

were tried together, before a jury, beginning on January 23, 2017. Each was convicted, as charged, on January 27, 2017.

{¶ 4} Esten Ciboro appealed his conviction, which this court decided on September 14, 2018 in *State v. Ciboro*, 6th Dist. Lucas Nos. L-17-1038, L-17-1039, 2018-Ohio-3705 (hereinafter "*State v. Esten Ciboro*"). Because the cases were tried together, involving a common victim and the same or similar evidence and witnesses, we refer to the summary of the trial, as set forth in our recent decision. We refer to Timothy Ciboro, the appellant in this case, as "appellant" and to Esten Ciboro as "Esten."

At trial, the state called several witnesses. As its first witness, the state called Karen Loudermill. Loudermill originally discovered S.H. during the course of her employment at Holland Building Services. According to Loudermill, she was taking trash out at the Port Authority building in Toledo on May 18, 2016, when she observed S.H. eating a Honey Bun. Loudermill stated that S.H. "was very frail, clothes was dirty, hair matted to her head." Given S.H.'s condition, Loudermill inquired as to whether she had run away from home. S.H. informed Loudermill that she had indeed run away from home. When asked why she decided to run away, S.H. explained that her father, [appellant], punishes her for wetting the bed by shackling her to the basement stairs, making her use the bathroom in a bucket, and forcing her to eat raw noodles and tuna off of the basement floor. Based upon S.H.'s representations, Loudermill called 911

3.

and informed law enforcement of the situation. At the conclusion of the 911 call, the dispatcher informed Loudermill that an officer would be sent to investigate the matter.

Officer Michael Garcia of the Toledo Police Department was the officer dispatched to S.H.'s location following Loudermill's 911 call. Garcia was also the state's second witness at trial. Garcia generally corroborated Loudermill's testimony concerning S.H.'s condition and the fact that she had been shackled in her basement by [appellant].

For its third witness, the state called Officer Paul Davis of the Toledo Police Department. Davis was working on the evening of May 18, 2016, and was charged with monitoring [Esten] and [appellant] while they awaited booking into the Lucas County jail. In order to safely place [Esten] and [appellant] into their holding cells, Davis had to first check their pockets. During the search, Davis retrieved a set of keys, including a handcuff key, from [Esten's] right zip cargo shorts pocket.

As its fourth witness, the state called Detective Terry Cousino of the Toledo Police Department Scientific Investigations Unit. On the evening of May 18, 2016, Cousino was tasked with executing a search warrant at [appellant's] residence. At trial, Cousino authenticated several photographs depicting the condition of the residence, including the basement where S.H. was shackled. Referencing the photographs, Cousino testified that the door

4.

leading to the basement was kept shut by a bungee cord with a gallon of liquid hanging on it.

In the basement, Cousino observed a support post to which leg cuffs, chains, and two Olympic barbell weight plates were attached. Adjacent to the support post, Cousino found a five-gallon bucket turned upside down with a pillow lying on top and two water bottles with S.H.'s name lying next to the bucket on the floor. Another five-gallon bucket filled halfway with ammonia was observed in close proximity to the support post. On the main floor, Cousino searched the office and found more sets of handcuffs in a dresser drawer. In the living room, Cousino discovered a set of dumbbells on the floor, which were linked together using handcuffs.

For its fifth witness, the state called S.H. According to her testimony, S.H. moved into [appellant's] home with her mother, who left the home when S.H. was seven years old. During the relevant time period, S.H. resided with [appellant], her sister, Ti.C., and her brother, T.Ci. [Esten], S.H.'s stepbrother, occasionally stayed at the house when he was not staying at his mother's house. After S.H.'s mother left the home, S.H. attempted to run away because she was being fed dried oats and missed her mother's family. Once S.H. was returned to the home, she was locked in the downstairs bathroom as a punishment for running away. According to

S.H., it was [Esten's] idea to lock her in the bathroom by reversing the door knob so that the lock was on the outside of the bathroom door.

S.H. testified that she had bed wetting issues that prompted [appellant] to lock her in the bathroom and, eventually, in the basement. S.H. would be placed in the bathroom with the door locked whenever [appellant] and the rest of the family went out of the house. Occasionally, S.H. would be permitted to sleep in the bathroom on the main floor. On such occasions, S.H. would sleep in the bathtub without blankets or a pillow. If she urinated while sleeping in the bathtub, S.H. would be forced to take a "really cold shower," and then stand in front of the air conditioner.

As punishment for her bed wetting, S.H. was forced to sleep in the basement without any clothes and with shackles around her feet. When asked how long she was kept in the basement, S.H. stated: "One time I was down there for, like, a year." While in the basement, S.H. was fed raw canned vegetables, bread, dried Ramen noodles, crackers, and tuna. S.H. was also forced to urinate in a five-gallon bucket alongside the support post to which she was shackled. The bucket was partially filled with ammonia. S.H. indicated that being in the basement scared her because there were mice and spiders in the basement.

S.H. went on to testify that [Esten] "started touching [her] inappropriately" sometime after she began to be locked in the bathroom.

S.H. recounted that the first encounter occurred while she was folding laundry and appellant made her perform oral sex on him. S.H. confirmed that this occurred on more than one occasion before she turned 13 years old. She also stated that [Esten] and [appellant] would make deals with her to provide her with candy "if they did things inappropriately with [her] or they had [her] do it to them." S.H. later clarified that the "inappropriate things" she was referring to included oral sex and intercourse. S.H. further recounted being in the basement and overhearing [appellant] direct her sister, Ti.C., to perform oral sex on him.

At the conclusion of S.H.'s testimony, the state called its sixth witness, Hallie Dreyer. Dreyer is a forensic scientist at the Ohio Bureau of Criminal Investigation. In that capacity, Dreyer conducted a DNA analysis on, inter alia, the handcuffs that were retrieved from [appellant's] residence. The results of the analysis revealed that S.H. was a major contributor of DNA and [appellant] was a minor contributor of DNA on the handcuffs.

As its seventh witness, the state called Ti.C. At the time of trial, Ti.C. was seven years old. During her testimony, Ti.C. revealed that she disliked residing in [appellant's] home because the punishments she received were unfair and [appellant] "would have sex with [her]." Speaking about punishment, Ti.C. stated that S.H. was punished by being locked up with chains and handcuffs and placed in the basement. She went

on to explain that S.H. was also chained up in the bathroom and in the living room from time to time. Ti.C. testified that [Esten] and [appellant] each directed S.H.'s punishments. Ti.C. then reiterated that [Esten] and [appellant] had sex with her and S.H. "more than once." She explained that [Esten] would have sex with her almost any day that [appellant] was not with her.

For its eighth witness, the state called David Connell, a clinical and forensic psychologist who was retained by the state to review the state's evidence in this case and interview S.H. During his review, Connell performed an educational test with S.H., which revealed that S.H. had a developmental disorder. Ultimately, Connell deemed S.H. to be intellectually deficient and diagnosed her with posttraumatic stress disorder. According to Connell, the treatment of S.H.'s condition would require intensive long-term individual therapy and, potentially, medications to address mental and emotional issues that may arise as S.H. develops.

As its ninth witness, the state called Lori Hinde. Hinde attends the Maumee United Methodist Church, where she organizes a 5K race that is held each year in honor of her father-in-law. In October 2015, [Esten] participated in the race alongside [appellant], Ti.C., and T.Ci. The family finished the race and attended an award potluck that was held inside the church at the conclusion of the race. Hinde testified that she "loaded up"

the children with food after the potluck because it "looked as if they were pretty darn hungry." She also observed [appellant] preventing Ti.C. and T.Ci. from finishing their meals.

For its tenth witness, the state called Kristie Gibbs. In her spare time, Gibbs enjoys running at a Toledo Metropark near her home. During her runs, Gibbs occasionally encountered [Esten] and the rest of the family, including S.H. Gibbs testified that she observed S.H. with the family in the summer of 2015, but she noticed that S.H. was absent from the runs by the spring of 2016.

As its eleventh witness, the state called Gayline Diller. Diller became familiar with [Esten] and the family during the course of her three-year employment with Costco. Diller testified that the family were "regulars" at Costco, meaning they would frequent the store on a daily basis to eat the food samples that were offered. Diller only ever observed [Esten], [appellant], Ti.C., and T.Ci. together at Costco. S.H. was not present with the rest of the family.

For its twelfth witness, the state called Sergeant Roy Kennedy of the Toledo Police Department. Kennedy was involved in the execution of the search warrant at [appellant's] residence. Sometime subsequent to the search, the residence was burglarized. Following the burglary, police were alerted to the fact that property bearing the family's name, including two

camera bags with camcorders and video cassettes, were turned into a local pawn shop. Kennedy secured a search warrant to retrieve the home videos, which were eventually admitted into the record and published to the jury. Two of the videos depicted races run in November 2012 by [Esten], Ti.C., and T.Ci. A third video captured Ti.C. and T.Ci. opening gifts on December 25, 2012. S.H. was notably absent from the videos.

As its thirteenth and final witness, the state called an expert in the treatment and diagnosis of child abuse, Dr. Randall Schlievert. Schlievert initially interviewed S.H. and conducted a physical examination on May 23, 2016. During the interview, S.H. informed Schlievert that she ran away from home because [appellant] had shackled her in the basement for extended periods of time. S.H. made no mention of sexual abuse during the interview. Schlievert testified concerning the findings of his physical examination of S.H., indicating that he found swelling in S.H.'s feet as well as semi-circular scarring and skin thickening on the sides and back of the right ankle that was consistent with the shape of a handcuff.

Schlievert conducted a second interview and examination of S.H. on September 15, 2016, following the reports of sexual abuse. During the second interview, S.H.

> detailed sexual abuse by both [Esten] and [appellant]. She told [Schlievert] that the first sexual abuse occurred from [Esten],

that he forced her to put her mouth on his private area and suck on it. These acts occurred more than once. And then eventually it led to [Esten] putting his tongue on her private parts, and also putting his private part into her back private parts. * * * And she wrote out that [appellant] put his private part in her front and back private parts, and then, also in her sister's back private part. * * * She said it felt weird, it was numerous times that [appellant] did this to her, and then also described that he would lay on her as well.

Despite S.H.'s allegations of sexual abuse, her physical examination was normal. Schlievert explained that a normal examination was not inconsistent with S.H.'s disclosure of sexual abuse. Indeed, Schlievert testified that a normal examination occurs 95 to 98 percent of the time in cases involving delayed disclosure of sexual abuse.

Based upon his interviews and examinations of S.H., as well as his review of the relevant medical records, Schlievert concluded, to a reasonable degree of medical certainty, that S.H. had been neglected and abused, both physically and psychologically. Moreover, Schlievert interviewed and examined Ti.C., who essentially corroborated S.H.'s reports of sexual abuse.

Following the presentation of Schlievert's testimony, the state rested. Thereafter, [Esten] and [appellant] moved the court for acquittal under Crim.R. 29, which was denied by the trial court.

After the trial court denied the Crim.R. 29 motion, [Esten] and [appellant] called T.Ci. as their sole witness. During his testimony, T.Ci. confirmed that S.H. was routinely handcuffed around her ankles as a form of punishment. T.Ci. also indicated that S.H. was forced to steal food because she was not provided adequate nutrition at home. T.Ci. went on to testify that [appellant] began touching him inappropriately when he was six years old.

Following T.Ci.'s testimony, [Esten] and [appellant] rested. They proceeded to renew their Crim.R. 29 motion at the close of evidence. Their motion was once again denied by the trial court. The jury then heard closing arguments, and received its instructions from the trial court. *State v. Esten Ciboro*, 6th Dist. Lucas Nos. L-17-1038, L-17-1039, 2018-Ohio-3705, at ¶ 4-26.

**{¶ 5}** Following deliberations, the jury found appellant guilty as to all counts set forth in the indictments. The trial court ordered the following prison terms: in case No. CR0201601971: eight years as to Count 1 (endangering children); eight years as to Count 2 (endangering children); 11 years as to Count 3 (kidnapping); 11 years as to Count 4 (kidnapping); in case No. CR0201602317: 36 months (endangering children);

12.

and in case No. CR0201602809: ten years to life as to Count 1 (rape); ten years to life as to Count 2 (rape); ten years to life as to Count 3 (rape); life in prison without parole as to Count 4 (rape); and life in prison without parole as to Count 5 (rape). All of the sentences were ordered to be served consecutively with one another.

{¶ 6} Appellant was appointed appellate counsel and appealed the judgments. He asserts four assignments of error for our review.

## Assignments of Error

I. Appellant, appearing pro se, received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

II. The trial court committed error to the prejudice to Appellant by imposing costs of prosecution without consideration of Appellant's present or future ability to pay.

III. The trial court erred in denying Appellant's Criminal Rule 29 motion.

IV. The jury's verdict was against the manifest weight of the evidence presented at trial.

## Law and Analysis

{¶ 7} Appellant claims that, in representing himself at trial, he violated his own right to receive effective assistance of counsel, in violation of his federal and state

constitutional rights. In his words, the "record is rife with errors committed by [appellant] as a result of his pro se representation." Appellant does not identify the errors, and he concedes that, because he waived his right to be represented by counsel, he may not assert a claim of ineffective assistance of counsel on appeal. Based upon our review of the record, we find that appellant's waiver of counsel was offered knowingly, intelligently and voluntarily. Therefore, we agree that appellant is barred from asserting this claim.

{¶ 8} A defendant's right to counsel during critical stages of the prosecution is guaranteed by the Sixth Amendment of the United States Constitution, made applicable to the states through the Fourteenth Amendment, and by Article I, Section 10, of the Ohio Constitution. *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227. The right to counsel "implicitly embodies a 'correlative right to dispense with a lawyer's help.'" *Martin* at ¶ 23, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). The right to represent oneself "is thwarted when counsel is forced upon an unwilling defendant, who alone bears the risks of a potential conviction." *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 26, citing *Faretta v. California*, 422 U.S. 806, 819-820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

{¶ 9} The United States Supreme Court and the Supreme Court of Ohio have recognized a criminal defendant's right to defend himself at trial without counsel when

14.

the defendant knowingly, intelligently, and voluntarily chooses to do so. *See Faretta* at 819-820; *State v. Gibson*, 45 Ohio St.2d 366, 377, 345 N.E.2d 399 (1976). In Ohio, Crim.R. 44 governs the procedure for the appointment of counsel and the waiver thereof. Where a defendant is charged with a serious offense –which includes "any felony"—and is unable to obtain counsel, counsel must be assigned to represent the defendant at all stages of the proceedings, "unless the defendant, after being fully advised of his right to assigned counsel, knowingly, intelligently, and voluntarily waives his right to counsel." Crim.R. 44(A) and 2(C). The waiver of counsel "shall be in open court and the advice and waiver shall be recorded." Crim.R. 44(C). In a serious-offense case, the waiver of counsel must also be in writing. *Id.*

{¶ 10} For the waiver to be valid, a trial court "must" explain to the defendant the following: "[1] the nature of the charges, [2] the statutory offenses included within them, [3] the range of allowable punishments thereunder, [4] possible defenses to the charges and circumstances in mitigation thereof, and [5] all other facts essential to a broad understanding of the whole matter." *Gibson* at 377, quoting *Von Moltke v. Gillies*, 332 U.S. 708, 723, 68 S.Ct. 316, 92 L.Ed. 309 (1948). Additionally, a trial court "should" explain that the defendant "will be required to follow the same rules of procedure and evidence which normally govern the conduct of a trial." *State v. Furr*, 1st Hamilton Dist. No. C-170046, 2018-Ohio-2205, ¶ 9, quoting *State v. Doane*, *69* Ohio App.3d 638, 646-647, 591 N.E.2d 737, ¶ 12 (11th Dist.1990). The assertion of the right to self-representation must be clear and unequivocal. *State v. Neyland*, 139 Ohio St.3d 353,

15.

2014-Ohio-1914, 12 N.E.3d 1112, ¶ 72. Whether a defendant knowingly, intelligently, and voluntarily waived the right to counsel is an issue that we review de novo. *State v. Griffin*, 10th Dist. Franklin No 10AP-902, 2011-Ohio-4250.

{¶ 11} In this case, the trial court appointed appellant counsel before his first arraignment. Early in the proceedings, appellant expressed his desire to represent himself. Initially, the court declined appellant's request but did agree to replace his counsel, about whom appellant expressed misgivings. At subsequent hearings, appellant renewed his request to represent himself, and a full hearing was conducted on the matter on September 22, 2016. After the court had thoroughly complied with Crim.R. 44(A) and reviewed appellant's written waivers with him (one for each indictment), the court granted his motion. Appellant's counsel agreed to stay on the case as "stand-by counsel." On October 6, 2016, appellant was arraigned on the rape charges set forth in the third indictment. By the end of that hearing, the court terminated appellant's self-representation for "deliberately engaging in serious and obstructionist misconduct" during the hearing, and it reappointed his counsel, who was in attendance. Appellant continued to argue in favor of self-representation at hearings on October 20 and 27, 2016, with the promise to behave appropriately. On November 30, 2016, the court explained to appellant the nature and elements of the charges, discussed possible defenses to the charges, and the potential sentences that he faced. The court informed him that he would be required to follow the same rules of procedure and evidence that govern the conduct of a trial and that, by representing himself, he was waiving his right to assert a claim of

16.

ineffective assistance of counsel on appeal. Appellant signed three waivers, one for each indictment, which the court reviewed with him. With appellant's approval, the court re-appointed the first attorney who had represented appellant to serve as stand-by counsel.

{¶ 12} At a pretrial hearing on December 12, 2017, and again after the trial began, the court confirmed with appellant whether he still wished to represent himself. Appellant insisted that he did, despite admonitions by the court of the "dangers" of proceeding without counsel. The court told appellant that he could retract his decision at any point during the trial, and that the court would reappoint counsel to represent him. In the interim, appellant's standby counsel remained available throughout the trial.

{¶ 13} The record demonstrates that the trial judge, on multiple occasions, extensively questioned appellant as to whether he understood the seriousness and the consequences of proceeding without counsel. It advised him that, by virtue of a lawyer's training, a lawyer would be better equipped to present a defense to the jury. It also advised him of the serious nature of the charges he faced and the penalties for each of those charges. Each time, appellant expressed his desire to represent himself, and he signed written waivers to that effect. Moreover, appellant had counsel to assist and consult with him at every stage of the proceeding. We find that the trial court complied with Crim.R. 44(A), that appellant clearly and unequivocally asserted his right to represent himself, and that he knowingly, intelligently, and voluntarily waived his right to counsel.

17.

**{¶ 14}** Appellant does not challenge the trial court's decision to accept his waiver of his right to counsel, and he further concedes that he is "precluded from making an argument regarding any lack of legal assistance by standby counsel." Indeed, such a claim is not cognizable where the appellant chose to pursue self-representation with his "eyes open." *Faretta*. Because we agree that appellant's waiver of his right to counsel was made voluntarily, knowingly, and intelligently, we find his first assignment of error not well-taken.

### Costs of Confinement and Appointed Counsel

**{¶ 15}** In his second assignment of error, appellant argues that the court erred in ordering appellant to pay the costs of his confinement and the costs of his appointed counsel.

**{¶ 16}** In each sentencing entry, the court held that appellant was "found to have, or reasonably may be expected to have, the means to pay all or part of the applicable costs of supervision, confinement, assigned counsel, and prosecution as authorized by law. Defendant ordered to reimburse the State of Ohio and Lucas County for such costs." Appellant argues that the record "provides no indication as to whether the trial court considered [his] ability to pay" the costs of confinement and appointed counsel.[1] Moreover, appellant disputes his ability to pay given that he was ordered to serve

---

[1] The trial court also ordered that appellant pay the costs of prosecution, pursuant to R.C. 2947.23; the costs associated with the citizens' reward program pursuant to R.C. 9.92(C); restitution pursuant to R.C. 2929.18; and a monthly supervision fee pursuant to R.C. 2951.021. Appellant does not challenge the imposition of these costs on appeal.

18.

multiple, consecutive sentences, including two life sentences without the opportunity for parole.

{¶ 17} Prior to imposing the costs at issue, the trial court must first find that the defendant has, or will have, the ability to pay. For example, R.C. 2929.18(A)(5)(a)(ii) requires that the trial court impose against all convicted defendants a financial sanction for the costs of confinement in a state institution "to the extent he is able to pay." Likewise, R.C. 2941.51(D) provides that the trial court can order the defendant to pay the cost of appointed counsel only if the court determines that the offender "has, or reasonably may be expected to have, the means to meet some part of the costs of the services rendered." *Id.* Although the court is not required to conduct a hearing on a defendant's ability to pay the costs, the record must contain some evidence that the court considered the defendant's financial ability to pay. *State v. Baughman*, 6th Dist. Lucas No. L-11-1045, 2012-Ohio-5327, ¶ 43, citing *State v. Maloy*, 6th Dist. Lucas No. L-10-1350, 2011-Ohio-6919, ¶ 13. Our standard of review on this issue is whether the imposition of costs and financial sanctions was contrary to law. R.C. 2953.08(A)(4) and (G)(2)(b). *State v. Farless*, 6th Dist. Lucas Nos. L-15-1060, 2016-Ohio-1571, ¶ 4 ("An appellate court may not modify a financial sanction unless it finds by clear and convincing evidence that it is not supported by the record or is contrary to law.").

{¶ 18} In each sentencing entry, the trial court specifically found that appellant had, or reasonably was expected to have, the means to pay all or part of the costs of confinement and assigned counsel. We find that the record supports the court's

19.

judgment. Appellant, who was 53 years old at the time of trial, described himself as physically and mentally healthy. He attended college for over two years, and while enrolled, he studied aerodynamics. Appellant is also a veteran of the United States Airforce and worked for the Toledo Fire Department. Given these facts and circumstances, the record reflects clear and convincing evidence in support of the disputed ruling that appellant exhibited an ability to pay fees for counsel. *Accord State v. Johnson*, 6th Dist. Williams No. WM-16-008, 2018-Ohio-527, ¶ 55-56, *discretionary appeal allowed,* 2018-Ohio-2418, 2018 Ohio LEXIS 1627 (Costs for appointed counsel upheld as to defendant who was sentenced to mandatory life in prison for rape, where the record reflects that defendant was 41 years old, possessed a "GED," was physically healthy, had a driver's license and received Social Security Disability benefits).

{¶ 19} Likewise, with regard to the costs of confinement, R.C. 5145.16(C)(8)(a) specifically allows the Ohio Department of Rehabilitation and Correction to collect a percentage of any earnings an inmate receives as part of a prison work program. The statute provides that ODRC may "allocate * * * [u]p to twenty-five per cent of the earnings [of the prisoner] to reimburse the state for room and board and for the expense of providing employment to the prisoner." Given appellant's education, general good health and his past employment history, he may have multiple opportunities to engage in prison work programs. When and if that occurs, R.C. 5145.16(C)(8)(a) provides a mechanism for the state to collect a percentage of his earnings. We find that the

20.

imposition of costs here was not contrary to law, and we therefore find that appellant's second assignment of error is not well-taken.

## Legal Sufficiency of the Evidence

{¶ 20} In his third assignment of error, appellant claims that the trial court erred when it denied his motion for an acquittal at the conclusion of the state's case. A motion for acquittal under Crim.R. 29(A) challenges the sufficiency of the evidence. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). We examine the evidence in the light most favorable to the state and decide whether any rational trier of fact could have found that the state proved, beyond a reasonable doubt, all of the essential elements of the crime. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997); *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 78. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386.

{¶ 21} Appellant challenges the sufficiency of the evidence *only* as it relates to case No. CR0201602809. In that case, appellant was convicted of five counts of rape, in

21.

violation of R.C. 2907.02(A)(1)(b) and (B), which provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * [w]hen * * * [t]he other person is less than 13 years of age, whether or not the offender knows the age of the other person." The term "sexual conduct" is defined by statute to mean "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01.

{¶ 22} Appellant claims that the state failed to provide sufficient evidence that he raped S.H. and Ti.C. In support, he cites a "lack of physical or forensic evidence" to establish the rapes. Specifically, appellant complains that (1) Dr. David Connell "did not address the issue of sexual abuse and did not interview [Ti.C.];" (2) Hallie Dryer, from BCI, did not test for DNA for the purpose of determining sexual abuse of either S.H. or [Ti.C.]; and (3) Dr. Schlievert's sexual abuse diagnosis lacks credibility because S.H. "delayed" reporting the abuse until her second appointment with him, Ti.C. made only "guarded statements" about the abuse, and because both victims underwent "normal physical exams."

{¶ 23} In this assignment of error, appellant is essentially challenging the credibility of the expert witnesses. We do not weigh credibility on a claim of legal insufficiency. *State v. Wampler*, 6th Dist. Lucas No. L-15-1025, 2016-Ohio-4756, ¶ 57.

22.

Moreover, appellant makes no mention of the direct evidence offered by the victims themselves that established five distinct counts of rape. By way of review, S.H. testified that appellant put his penis "in the back of me and in the front" and that "he also put it in my mouth." In Ohio, "multiple separate and distinct acts of penetration will support multiple convictions and sentences, and oral, anal, and vaginal rapes constitute separate and distinct acts." *State v. Hall*, 6th Dist. Lucas No. L-17-1069, 2018-Ohio-619, ¶ 10. S.H. also confirmed that she was under the age of 13 at the time and that appellant's penis went "inside" of her body. Likewise, Ti.C., who was seven years old at trial, testified that appellant put "his private in me" and made me "suck it" more than once. Later, she testified that appellant put his penis in "my private part and my butt." In determining whether a conviction is based on sufficient evidence, an appellate court does not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *See Jenks* at paragraph two of the syllabus; *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim). The testimonial evidence offered by S.H. and Ti.C., if believed, is sufficient to support each rape conviction. Moreover, "[t]here is no requirement, statutory or otherwise, that a rape victim's testimony must be corroborated as a condition precedent to conviction." *Wampler* at ¶ 58; *State v. Reinhardt*, 10th Dist. Franklin No. 04AP-116, 2004-Ohio-6443, ¶ 29.

{¶ 24} The record reflects ample evidence from which a rational trier of fact could have found the essential elements of multiple rapes committed by appellant, against S.H.

23.

and Ti.C., proven beyond a reasonable doubt.  Appellant's third assignment of error is not well-taken.

## Manifest Weight of the Evidence

{¶ 25} In his fourth and final assignment of error, appellant argues that his convictions were against the manifest weight of the evidence.

{¶ 26} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony."  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.  In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered.  *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 27} A conviction should be reversed on manifest weight grounds only in the most "'exceptional case in which the evidence weighs heavily against the conviction.'"  *Thompkins* at 387, quoting *Martin* at 175.  Moreover, "'it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court finds that a reasonable juror could not find the testimony of the witness to be credible.'"

24.

*State v. Brown*, 10th Dist. Franklin No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. Franklin No. 96APA04-511, 1997 Ohio App. LEXIS 416 (Feb. 6, 1997).

{¶ 28} Here, appellant argues that the victims' testimony was not credible because S.H. "delayed" reporting the abuse to Dr. Schlievert until their second meeting and because Ti.C. was "guarded" during her appointment with him, i.e., the same arguments advanced in support of his third assignment of error. "A conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution testimony." *State v. Dean*, 6th Dist. Lucas No. L-16-1301, 2018-Ohio-1740, ¶ 44, quoting *State v. Houston*, 10th Dist. Franklin No. 04AP-875, 2005-Ohio-4249, ¶ 38 (reversed and remanded in part on other grounds).

{¶ 29} Appellant also cites a lack of any physical or forensic evidence to support the victims' claims of sexual abuse. First, "corroboration of victim testimony in rape cases is not required." *State v. Johnson, 112 Ohio St.3d 210,* 2006-Ohio-1379, 858 N.E.2d 1144, ¶ 53. Second, we extend special deference to the fact finder's credibility determinations, given that it is the fact finder who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury was free to choose which witnesses to credit and how to interpret the evidence before it. None of the arguments advanced by appellant undermine the jury's ultimate conclusion that the state proved all of the elements of its case against appellant beyond a reasonable doubt.

25.

**{¶ 30}** We find each of appellant's four assignments of error not well-taken, and we affirm the January 30, 2017 judgments of the Lucas County Court of Common Pleas. Pursuant to App.R. 24, appellant is ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, P.J.
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.